IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

MARGARET WHITE, on Behalf of      )
Herself and All Others            )
Similarly Situated,               )
                                  )
    Plaintiff,                    )
                                  )
v.                                )      No. 08-2478
                                  )
BAPTIST MEMORIAL HEALTH CARE      )
CORPORATION, and BAPTIST          )
MEMORIAL HOSPITAL-DESOTO,         )
INC.,                             )
                                  )
    Defendants.                   )

---

ORDER GRANTING DEFENDANTS' MOTION TO DECERTIFY COLLECTIVE ACTION

---

Plaintiff Margaret White ("White") alleges that Defendants Baptist Memorial Health Care Corporation ("BMHCC") and Baptist Memorial Hospital-DeSoto, Inc. ("Baptist Desoto" and, collectively, "Baptist") violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., by failing to compensate her and other similarly situated hourly employees for all hours worked. (See Compl. ¶¶ 1-2, ECF No. 1.) Before the Court is Baptist's February 15, 2011 Motion to Decertify Collective Action. (See Mot. to Decertify Collective Action, ECF No. 233.) White responded in opposition on March 15, 2011. (See Pl.'s Resp. to Defs.' Mot. to Decertify Collective Action, ECF No. 250.) Baptist replied on April 12, 2011. (See Reply in Supp.

of Mot. to Decertify Collective Action, ECF No. 261.)
("Baptist's Reply") For the following reasons, Baptist's motion
is GRANTED.

## I.  Background[1]

BMHCC is the non-profit, parent corporation of a number of
subsidiary corporations operating hospital facilities in the
Mid-South. (See Ray Decl. ¶¶ 4-5, ECF No. 233-3.) One of those
subsidiaries is Baptist DeSoto, which operates a hospital in
Southaven, Mississippi. (Id. ¶ 6.) When this litigation began
in the fall of 2008, Baptist DeSoto had more than sixty
departments staffed by approximately 1,600 employees working in
positions that would be non-exempt under the FLSA. (See Banks
Decl. ¶ 3, ECF No. 233-3.) One of those employees was White,
who worked as a nurse in Baptist DeSoto's emergency department
from 2005 to August 1, 2007. (See Banks Decl. ¶ 5.)

Baptist required its hourly employees to take daily,
uncompensated meal breaks. (See Baptist Policy Manual, Ex. 3,
ECF No. 233-4.) To account for those breaks, Baptist's payroll
system automatically deducted from each hourly employee's
compensation an amount representing the time the employee
received for meal breaks during the relevant pay period. (See
Garrison Dep. 18:16-18:20, Mar. 22, 2010, ECF No. 250-2.) If an

---

[1] The facts in this Part come from affidavits, declarations, and depositions
submitted by the parties and are recited for background purposes only.
Although the Court must consider the parties' evidence to decide Baptist's
motion, it does not engage in fact finding.

employee experienced any work-related interruption during a meal break, no matter how brief, the employee was to receive a subsequent, uninterrupted meal break or be paid as if she had worked through the entire meal break.[2]  (See Banta Dep. 40:16-41:17, Mar. 22, 2010, ECF No. 250-3.)

Although the automatic deduction policy applied to all Baptist hospitals, there was no system-wide policy allowing employees to cancel the automatic deduction when they experienced interrupted or missed meal breaks.  "Each [d]epartment [was] free to formulate the procedure that work[ed] best for its employees to govern how exceptions [were] recorded" in that department.  (See Banks Decl. ¶ 8.)  Many departments maintained "exception logs," paper records where employees were able to note interrupted or missed meal breaks.  (See id.)

Within Baptist DeSoto, the departments had been instructed to use an exception log formatted and distributed by the hospital's human resources director.  (See Banks Dep. 23:16-23:23, 48:3-49:3, Aug. 20, 2010, ECF No. 250-4).  Although some departments did not use that particular log, many of them maintained some type of paper record for employees to report time worked during meal breaks.  (See Simpson Decl. ¶¶ 4-5, ECF No. 233-3; Stone Decl. ¶¶ 5-6, ECF No. 233-3.)  In a few

---

[2] This Order refers to Baptist's policy of requiring hourly employees to take daily meal breaks and its practice of deducting automatically an amount of compensation equal to the time employees received for those breaks as the "meal break policy" or "automatic deduction policy".

departments, employees were permitted to verbally inform their supervisors about time worked during meal breaks. (See V. Johnson Dep. 74:15-74:20, Jan. 11, 2011, ECF No. 233-3; King Dep. 9:18-10:3.) Whether through an exception log or another process, an hourly employee had to self-report her missed or interrupted meal breaks to Baptist to ensure she received proper compensation.[3] (See Garrison Dep. 23:20-23:22.)

All Baptist DeSoto employees learned about the automatic deduction policy at a system-wide orientation after they were hired. (See B. Johnson Dep. 17:21-18:5, 20:11-20:20, Mar. 23, 2010, ECF No. 250-5.) Baptist DeSoto also conducted a facility-specific orientation, where employees received copies of the model exception log developed by human resources and instructions on how to complete it. (See id. 44:17-46:15.) The individual departments at Baptist DeSoto also conducted department-level orientations, where the automatic deduction policy was discussed. (See Barbaree Dep. 16:20-17:2, Mar. 23, 2010, ECF No. 250-6.) After those orientations, Baptist did not regularly assess employees' understanding of and compliance with the exception procedures and did not regularly discipline employees for working through meal breaks without reporting that time. (See id. 43:15-44:17.) Baptist's Policy Manual discussed

---

[3]   This Order refers to the requirement that Baptist employees take some affirmative action to cancel or reverse the automatic deduction for meal breaks as the "exception procedures".

the meal break policy, however, and was available on Baptist's intranet. (See id. 29:2-29:9.)

At a corporate level, Baptist did not train department managers on educating new employees about the automatic deduction policy and exception procedures during departmental orientations and did not monitor or audit those orientations. (See Rhea Dep. 25:5-26:15, 28:4-29:10, Mar. 22, 2010, ECF No. 250-8.) Baptist instructed managers on the automatic deduction policy and exception procedures in their initial training class and, occasionally, at monthly meetings. (See B. Johnson Dep. 41:5-41:24.) In the training class, managers were told that they should use their department's process for exceptions and that employees would be paid for time worked during meal breaks. (See Barbaree 34:7-34:20.) Baptist did not regularly assess managers' understanding and departments' implementation of the automatic deduction policy and exception procedures. (See Garrison Dep. 29:12-29:20, 63:5-64:1; B. Johnson Dep. 43:21-44:17; 50:20-51:6.)

On July 16, 2009, the Court conditionally certified a class of hourly employees of Baptist DeSoto "who suffered automatic deductions for lunch or other breaks[,] but who actually worked all [or] part of one or more of those lunches or breaks" without receiving compensation. (See Order Granting in Part and Denying in Part Pl.'s Mot. for Conditional Certification and Notice 3,

19-20, ECF No. 46; Order Approving Notice and Notice Plan, ECF No. 49.)   Since then, approximately two hundred current and former Baptist DeSoto employees have joined the collective action as opt-in plaintiffs (the "Opt-in Plaintiffs").   (See Notices of Consent to Join, ECF No. 40, ECF Nos. 51-59, ECF Nos. 59-83.)   The Court granted summary judgment in favor of Baptist on White's individual FLSA claim on March 23, 2011, but the Opt-in Plaintiffs' claims remain before the Court.   (See Order Granting Defs.' Mot. for Summ. J., ECF No. 258.)

## II.  Jurisdiction

Because White alleges violations of the FLSA, this Court has subject matter jurisdiction under the general grant of federal question jurisdiction in 28 U.S.C. § 1331.

## III. Standard of Review

Section 216(b) of the FLSA permits employees to recover unpaid overtime compensation by suing an employer "in behalf of . . . themselves and other employees similarly situated."   29 U.S.C. § 216(b).   "Section 216(b) establishes two requirements for a representative action: 1) the plaintiffs must actually be 'similarly situated,' and 2) all plaintiffs must signal in writing their affirmative consent to participate in the action." Comer v. Wal-Mart Stores, Inc., 454 F.3d 544, 546 (6th Cir. Mich. 2006) (citing 29 U.S.C. § 216(b) and Hoffmann-La Roche, Inc., v. Sperling, 493 U.S. 165, 167-68 (1989)).   Unlike a class

action under Federal Rule of Civil Procedure 23, in a collective or representative action under the FLSA, similarly situated employees must "opt into" the action by filing written consents. Compare 29 U.S.C. § 216(b), with Fed. R. Civ. P. 23; see also Comer, 454 F.3d at 546.   Employees named in the collective action complaint are called "named" or "lead" plaintiffs, and those who opt in by later filing written consents are called "opt-in" plaintiffs.   See Frye v. Baptist Mem. Hosp., No. 07-2708, 2010 WL 3862591, at *2 n.4 (W.D. Tenn. Sept. 27, 2010). Unlike absent class members in a Rule 23 class action, opt-in plaintiffs who file written consents and join the collective action are party plaintiffs.   O'Brien v. Ed Donnelly Enters., 575 F.3d 567, 583 (6th Cir. 2009) (citation omitted).

To determine whether plaintiffs are similarly situated, courts generally employ a two-stage inquiry.   See id.; Comer, 454 F.3d at 546; Frye, 2010 WL 3862591, at *2.   "The first takes place at the beginning of discovery. The second occurs after all of the opt-in forms have been received and discovery has concluded."[4]   Comer, 454 F.3d at 546 (citation and internal quotation marks omitted).

At the first stage, courts apply a "fairly lenient" standard to determine whether plaintiffs are similarly situated,

---

[4] Technically, a motion to decertify the collective action triggers the second-stage analysis.   For that reason, courts often refer to the second stage as the "decertification stage." See, e.g., Wilks v. Pep Boys, No. 3:02-0837, 2006 WL 2821700, at *2 (M.D. Tenn. Sept. 26, 2006).

relying on the pleadings and any filed affidavits. See Comer, 454 F.3d at 547; Carter v. Jackson-Madison Cnty. Hosp. Dist., No. 1:10-cv-01155-JDB-egb, 2011 WL 1256625, at *13 (W.D. Tenn. Mar. 31, 2011); Pacheco v. Boar's Head Provisions Co., Inc., 671 F. Supp. 2d 957, 959 (W.D. Mich. 2009); Fisher v. Mich. Bell Tel. Co., 665 F. Supp. 2d 819, 825 (E.D. Mich. 2009) (citations omitted). Named plaintiffs need only make a "modest factual showing" of class-wide discrimination. See Comer, 454 F.3d at 546; Jackson, 2011 WL 1256625, at *14; Pacheco, 655 F. Supp. 2d at 825 (citations omitted); cf. Fisher, 655 F. Supp. 2d at 825 (noting that named plaintiffs must "submit evidence establishing at least a colorable basis for their claim that a class of similarly situated plaintiffs exists" (citation and internal quotation marks omitted)). If a court concludes that the potential opt-in plaintiffs are similarly situated to the named plaintiffs, the court conditionally certifies the class, and potential opt-in plaintiffs are provided notice and an opportunity to join the action by filing written consents. See Comer, 454 F.3d at 547; Carter, 2011 WL 1256625, at *18; Fisher, 655 F. Supp. 2d at 828-29. Although courts typically grant conditional certification, that certification is "by no means final." See Comer, 454 F.3d at 547 (citation omitted).

At the second stage, courts apply a "stricter standard." Id.; Jordan v. IBP, Inc., 542 F. Supp. 2d 790, 812 (M.D. Tenn.

2008) ("The burden of demonstrating that class members are similarly situated is significantly higher at the decertification stage . . . ." (citation omitted)). Named plaintiffs "bear the burden of showing that the opt-in plaintiffs are similarly situated to the[m]." O'Brien, 575 F.3d at 584 (citation omitted). Because the second stage follows discovery, a court "has much more information on which to base its decision" and "examine[s] more closely the question of whether particular members of the class are, in fact, similarly situated." Comer, 454 F.3d at 547 (citation and internal quotation marks omitted); see Frye, 2010 WL 3862591, at *2 (citations omitted); cf. White v. MPW Indus. Servs., 236 F.R.D. 363, 366 (E.D. Tenn. 2006) (contrasting its first-stage analysis with the second-stage analysis and explaining that, at the second stage, a court "makes a factual determination on the similarly situated question" (citing Mooney v. Aramco Servs. Co, 54 F.3d 1207, 1213 (5th Cir. 1995))). To avoid decertification, the named plaintiffs must introduce "substantial evidence" that the opt-in plaintiffs are similarly situated. Frye, 2010 WL 3862591, at * 2 (citations omitted); see Crawford v. Lexington-Fayette Urban Cnty. Gov't, No. 06-299-JBC, 2008 WL 2885230, at *5 (E.D. Ky. July 22, 2008) (citations omitted); cf. Heldman v. King Pharm., Inc., No. 3-10-1001, 2011 WL 465764, at *3 (M.D. Tenn. Feb. 2, 2011) (contrasting first-stage analysis with

second-stage analysis and explaining that, at the second stage, a plaintiff must show "substantial evidence" (citing <u>Frye</u>, 2010 WL 3862591, at *2))).

Although the "similarly situated" requirement is elevated at the second stage, it remains less stringent than the requirement that common questions predominate in certifying class actions under Rule 23. <u>O'Brien</u>, 575 F.3d at 584 (citing <u>Grayson v. K Mart Corp.</u>, 79 F.3d 1086, 1095-96 (11th Cir. 1996)). Plaintiffs need not be identically situated to proceed collectively. <u>Comer</u>, 454 F.3d at 546-47; <u>Frye</u>, 2010 WL 3862591, at *3; <u>Crawford</u>, 2008 WL 2885230, at *5 (citations omitted). At the second stage, "the question is simply whether the differences among the plaintiffs outweigh the similarities of the practices to which they were allegedly subjected." <u>Monroe v. FTS USA, LLC</u>, ___ F. Supp. 2d ___, 2011 WL 442050, at *12 (W.D. Tenn. Feb. 7, 2011) (citing <u>Frye</u>, 2010 WL 3862591, at *3); <u>see also</u> <u>Wilks v. Pep Boys</u>, No. 3:02-0837, 2006 WL 2821700, at *3 (M.D. Tenn. Sept. 26, 2006) (citation omitted).

If a court concludes that the plaintiffs are similarly situated, it denies the motion to decertify, and the action proceeds collectively. <u>See</u> <u>Hipp v. Liberty Nat'l Life Ins. Co.</u>, 252 F.3d 1208, 1218 (11th Cir. 2001); <u>Monroe</u>, 2011 WL 442050, at *12, 15 (citations omitted). If the court concludes that plaintiffs are not similarly situated, it "decertifies the

10

class, and the opt-in plaintiffs are dismissed without prejudice. The class representatives—i.e. the original plaintiffs—proceed to trial on their individual claims." <u>Hipp</u>, 252 F.3d at 1218 (citations and internal quotation marks omitted); <u>Frye</u>, 2010 WL 3862591, at *3, 10 (citation omitted); <u>see also</u> <u>Alvarez v. City of Chicago</u>, 605 F.3d 445, 450 (7th Cir. 2010) (explaining that "[w]hen a collective action is decertified, it reverts to one or more individual actions on behalf of the named plaintiffs"); <u>Sandoz v. Cingular Wireless LLC</u>, 553 F.3d 913, 916 n.2 (5th Cir. 2008) (explaining that, if plaintiffs are not similarly situated, the court "must dismiss the opt-in employees, leaving only the named plaintiff's original claims"); <u>cf.</u> <u>O'Brien</u>, 575 F.3d at 573 (affirming dismissal of the opt-in plaintiffs and noting that most later filed individual actions); <u>Fox v. Tyson Foods, Inc.</u>, 519 F.3d 1298, 1301 (11th Cir. 2008) (affirming decertification of an FLSA collective action, dismissal of the opt-in plaintiffs, and severance of named plaintiffs into multiple individual actions) (citations omitted).

**IV.   Analysis**

**A. Named Plaintiff's Lack of an FLSA Claim**

At the decertification stage, the question is whether the "the opt-in plaintiffs are similarly situated to the lead plaintiffs." <u>O'Brien</u>, 575 F.3d at 584 (citation omitted).

Baptist argues that, because the Court granted summary judgment in favor of Baptist on White's individual FLSA claim, she is not similarly situated to the Opt-in Plaintiffs and decertification is proper. (See Baptist's Reply 27-28.)

Where a named plaintiff's FLSA claim has failed, she "cannot represent others whom she alleged were similarly situated." See Grace v. Family Dollar Store, Inc. (In re Family Dollar FLSA Litig.), ___ F.3d ___, 2011 WL 989558, at *10 (4th Cir. Mar. 22, 2011). In In re Family Dollar, the Court of Appeals for the Fourth Circuit affirmed a district court's grant of summary judgment in favor of the defendant on the named plaintiff's FLSA claim. See id. at *9. Having concluded that the named plaintiff had no claim, the court decided that it need not address whether the district court's refusal to certify her collective action was also proper because, "[w]ithout a viable claim," she could not have been similarly situated to the employees she sought to represent. See id.

The court's reasoning in In re Family Dollar comports with that of the Court of Appeals for the Sixth Circuit in O'Brien, which considered the converse of the facts in In re Family Dollar. See O'Brien, 575 F.3d at 586. In O'Brien, the Court of Appeals affirmed a district court's decertification of a collective action because the only opt-in plaintiff whose claims had not been previously mooted or claim-precluded had no viable

claim "because she failed to allege that she suffered from either unlawful practice." See id. Because the opt-in plaintiff had no claim, she was "clearly not similarly situated to the lead plaintiffs." Id. Considered together, In re Family Dollar and O'Brien stand for the proposition that named plaintiffs and opt-in plaintiffs must have viable FLSA claims to be deemed similarly situated and proceed collectively under Section 216. See In re Family Dollar, 2011 WL 989558, at *10; O'Brien, 575 F.3d at 586.

Although numerous Opt-in Plaintiffs have joined this collective action, White is the only named plaintiff. (See Compl. ¶ 1.) This Court granted summary judgment on White's FLSA claim because there was no evidence that she had performed work for which she was not properly compensated. See White v. Baptist Mem. Health Care Corp., No. 08-2478, 2011 WL 1100242, at *7 (W.D. Tenn. Mar. 23, 2011). "Without a viable claim," White cannot be similarly situated to the Opt-in Plaintiffs she seeks to represent, whose FLSA claims have not been adjudicated on the merits. See In re Family Dollar FLSA Litig., 2011 WL 989558, at *10. Because White's FLSA claim failed on the merits, but the Opt-in Plaintiffs' claims have not been adjudicated, White cannot meet her burden of showing that she and Opt-in Plaintiffs are similarly situated. See In re Family Dollar, 2011 WL

13

989558, at *10; cf. O'Brien, 575 F.3d at 586.   Decertification is proper.

### B. Partial Decertification

In O'Brien, the Court of Appeals explained that, where some plaintiffs have not alleged violations of the FLSA, the "court should examine whether partial decertification is possible." O'Brien, 575 F.3d at 586.   "The option of partial certification is important to consider, because it counters the argument that a collective action must be totally decertified if some members are not similarly situated to the others."   Id.   The court explained that "plaintiffs who are not similarly situated . . . could be dismissed while keeping intact a partial class."

O'Brien did not consider the situation presented by this action—where a court has concluded on the merits that a named plaintiff has no FLSA claim, but the opt-in plaintiffs' FLSA claims have not been adjudicated on the merits.   Indeed, in explaining that a court should consider decertification, the O'Brien court implied that the named plaintiffs' FLSA claims must be viable:   "Plaintiffs who do present evidence that they are similarly situated to the lead plaintiffs should not be barred from the opportunity to be part of a FLSA collective action, because the collective action serves an important remedial purpose."   Id. (emphasis added).

14

Because White's individual FLSA claim has been dismissed, she is not similarly situated to the Opt-in Plaintiffs. See In re Family Dollar, 2011 WL 989558, at *10. Before the Court granted summary judgment on White's claim, however, she had responded to Baptist's motion to decertify and advanced various arguments on behalf of the Opt-in Plaintiffs in her capacity as named plaintiff. (See Pl.'s Resp.; Mem. in Supp. of Resp. to Def.'s Mot. to Decertify Collective Action, ECF No. 250-1 ("Pl.'s Mem.").) Because the remaining Opt-in Plaintiffs are party plaintiffs, the Court will consider White's arguments and the evidence in the record to decide whether some or all of the Opt-in Plaintiffs are similarly situated to one other such that, although White's individual FLSA claim has been adjudicated, partial decertification is possible. See O'Brien, 575 F.3d at 583, 585-86.

The Court of Appeals has not created "comprehensive criteria for informing the similarly-situated analysis." See id. at 585. Courts generally consider (1) the factual and employment settings of the individual plaintiffs, (2) the likely defenses that appear to be individual to each plaintiff, and (3) the degree of fairness and the procedural impact of resolving the claims collectively. See id. at 584-85; Monroe, 2011 WL 442050, at *12; Frye, 2010 WL 3862591, at *3; Crawford, 2008 WL

15

2885230, at *5; <u>Jordan</u>, 542 F. Supp. 2d at 812; <u>Wilks</u>, 2006 WL 2821700, at *3 (citations omitted).

## 1. Factual and Employment Settings

In considering plaintiffs' factual and employment settings, courts review issues such as location, job duties, supervision, and salaries. <u>Frye</u>, 2010 WL 3862591, at *3; <u>Crawford</u>, 2008 WL 2885230, at *5; <u>Wilks</u>, 2006 WL 2821700, at *3 (citations omitted). Baptist argues that the Opt-in Plaintiffs' disparate factual and employment settings make decertification proper. (<u>See</u> Mem. of Law and Facts in Supp. of Defs.' Mot. to Decertify Collective Action 10-43, ECF No. 233-1.) ("Baptist's Mem.") White argues that the purported differences among the Opt-in Plaintiffs' factual and employment settings are superficial and irrelevant because their "common theory exists without regard to job duties, location, or supervision." (<u>See</u> Pl.'s Mem. 14-28.)

Although the Opt-in Plaintiffs were all employees of Baptist DeSoto, each worked in one of more than sixty different departments at the hospital. (<u>See</u> Banks Decl. ¶ 3.) Their job duties varied significantly, depending on their departments. Some of the Opt-in Plaintiffs worked in specialized medical departments, focusing on patient care. (<u>See, e.g.</u>, Corey Dep. 16:10-16:21, 18:11-20:18, ECF No. 234 (stating that she provided direct care to patients while working in the "ICU step-down" department); <u>see also</u> Lee Dep. 31:1-31:11, Dec. 7, 2010, ECF No.

16

234; McPhail Dep. 41:20-43:23, ECF No. 234; Vierhout Dep. 20:25-21:4, ECF No. 234.)   Other Opt-in Plaintiffs worked in non-medical departments, supporting the hospital's core function of providing patient care. (See, e.g., V. Johnson Dep. 26:9-27:23, Jan. 11, 2011, ECF No. 234 (stating that she did not provide direct care to patients while working in the admissions department); see also Howard Dep. 35:14-35:19, Dec. 12, 2010, ECF No. 234; McClore Dep. 18:12-18:24, Jan. 14, 2011, ECF No. 234.)

Within departments, job duties also varied.  In departments focused on medical care, staff nurses worked "on the floor" and provided direct care to patients. (See, e.g., Corey Dep. 16:10-16:21, 18:11-20:18 (explaining that she assessed and monitored patients and administered their medications).)  By contrast, unit coordinators provided administrative support to those providing direct care. (See, e.g., Griggs Dep. 28:25-30:6, July 31, 2010, ECF No. 234 (explaining that her primary duty as a unit coordinator was entering orders in a computer).)  The duties of some Opt-in Plaintiffs varied from shift to shift depending on their department's needs. (See, e.g., Pipkin Dep. 41:7-42:14, Nov. 16, 2010, ECF No. 234 (explaining that, as a charge nurse, she generally assigned patients to the other nurses and managed the unit but that, when the unit was busy, she also provided direct care to patients).)  The job duties of

17

Opt-in Plaintiffs who worked in non-medical departments also varied. (See, e.g., Ester Dep. 27:10-33:9, Oct. 13, 2010, ECF No. 234 (explaining that, as a "dipper" and dish washer in the food and nutrition department, she worked exclusively in the kitchen and dish room and did not provide patient care); Mitchell Dep. 50:5-50:12, 52:3-54:8, Sept. 3, 2010, ECF No. 234 (explaining that, as a catering associate in the food and nutrition department, she delivered food directly to patients in the hospital).)

Differences in the Opt-in Plaintiffs' job duties are highly relevant to their claims that they worked during meal breaks without compensation because their job duties dictated whether and why they experienced missed or interrupted meal breaks. Some Opt-in Plaintiffs working in medical departments did not have scheduled meal breaks and had to care for their patients during meal breaks. (See, e.g., Corey Dep. 46:9-47:23.) By contrast, some Opt-in Plaintiffs working in non-medical departments had scheduled meal breaks. (See, e.g., Howard Dep. 46:7-47:15.) Some Opt-in Plaintiffs in non-medical departments were required to carry pagers during their shifts, and their meal breaks were interrupted. (See, e.g., Mitchell Dep. 54:9-55:11 (explaining that, as a catering associate, she carried a pager and that her meal breaks would be occasionally interrupted by requests for service she received on the pager).)

18

Because there was no central policy for reporting time worked during meal breaks, Opt-in Plaintiffs reported missed and interrupted breaks in different ways, depending on the systems their departments used. (See Banks Decl. ¶ 8.) Many departments used exception logs. (See id.) In some departments, if an hourly employee experienced a missed or interrupted meal break, management attempted to schedule a later meal break, and, if that were not possible, the employee recorded the missed or interrupted break in an exception log. (See Simpson Decl. ¶ 4.) In other departments, employees verbally informed their supervisors about time worked during meal breaks. (See V. Johnson Dep. 74:15-74:20; King Dep. 9:18-10:3.)

Despite these differences, White argues that the Opt-in Plaintiffs are similarly situated because the Opt-in Plaintiffs can "demonstrate the existence of common policies or practices with respect to missed and interrupted meal breaks." (See Pl.'s Mem. 18.) Specifically, White argues that all of the Opt-in Plaintiffs were subject to Baptist's automatic deduction policy, its "attempt[] to shift the burden of ensuring they are paid for all time worked from [Baptist] to them, and Baptist's "inadequate education, training, and monitoring" about its automatic deduction policy and exception procedures. (See id.

19

at 26-27.) According to White, Baptist's policies and practices make the Opt-in Plaintiffs similarly situated. (See id.)

Although showing a "unified policy of violations" is not required, see O'Brien, 575 F.3d at 585, a material factor in considering plaintiffs' factual and employment settings is whether they were affected by a single decision, policy, or plan. See Frye, 2010 WL 3862591, at *5; Crawford, 2008 WL 2885230, at *4; Wilks, 2006 WL 2821700, at *3 (citations omitted). "[I]t is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs." O'Brien, 575 F.3d at 585. "The existence of this commonality may assuage concerns about plaintiffs' otherwise varied circumstances." Wilks, 2006 WL 2821700, at *3 (citations omitted).

To bind together otherwise differently situated employees, an alleged common policy must potentially violate the FLSA. See O'Brien, 575 F.3d at 585; see Oetinger v. First Residential Mortg. Network, Inc., No. 3:06-CV-381-H, 2009 WL 2162963, at *3 (W.D. Ky. July 16, 2009) (explaining that "companies may indeed apply company-wide policies to their employees, but these policies must cause the alleged FLSA violation for the policy to be considered as a factor in determining whether employees are 'similarly situated' for purposes of bringing a collective

20

action"). Standing alone, an employer policy providing automatic deductions for meal breaks does not violate the FLSA. See Fengler v. Crouse Health Found., Inc., 595 F. Supp. 2d 189, 195 (N.D.N.Y 2009); see also Wage and Hour Div., U.S. Dep't of Labor Fact Sheet No. 53, The Health Care Industry and Hours Worked (July 2009), ECF No. 373-16, available at http://www.dol.gov/whd/regs/compliance/ whdfs53.pdf (recognizing that the FLSA permits automatic deduction policies) ("DOL Fact Sheet"). Therefore, Baptist's mere adoption of a system that, by default, deducts meal breaks from its employees' compensation does not constitute a unified policy of FLSA violations capable of binding together the Opt-in Plaintiffs.

Where an employer's formal policy is to compensate employees for all time worked, courts have generally required a showing that the employer's "common or uniform practice was to not follow its formal, written policy." Pacheco, 671 F. Supp. 2d at 959. There must be a showing that "enforcement of the automatic deduction policy created a policy-to-violate-the-policy." See Saleen v. Waste Mgmt., Inc., No. 08-4959, 2009 WL 1664451, at *4 (D. Minn. June 15, 2009) (citing Thompson v. Speedway SuperAmerica, LLC, No. 08-CV-1107 (PJS/RLE), 2009 WL 130069, at *2 (D. Minn. Jan. 9, 2009)) (denying conditional certification where employees failed to show a corporate

21

decision by employer not to follow its formal policy of paying for time worked during meal breaks).

Baptist's official policy is to compensate employees for time worked during meal breaks. (See Banks Decl. ¶ 6.) There is no direct evidence that Baptist maintained a de facto policy to the contrary. Most Opt-in Plaintiffs deposed by Baptist admit that, when they used their departments' exception procedures, Baptist paid them for time worked during meal breaks. (See Collective Ex. 9, ECF No. 236.) Nor is there circumstantial evidence that would permit the Court to infer any illicit de facto policy on Baptist's part. Most Opt-in Plaintiffs deposed by Baptist admit that they were never discouraged from or retaliated against for reporting time worked during meal breaks. (See Collective Ex. 8, ECF No. 235-1.)

White also argues that the Opt-in Plaintiffs are similarly situated because they were all subject to Baptist's "attempt to shift enforcement of the FLSA . . . to its employees." (See Pl.'s Mem. 21-26.) White emphasizes that Baptist required its employees to self-report time, although it was aware that they were working through meal breaks and that Baptist could have implemented a more accurate system to monitor employees and ensure they were compensated. (See id. at 22-23.) The essence of White's argument is that, by shifting the burden to its employees, Baptist abdicated its FLSA duties. (See id.)

22

Under the FLSA, management has a duty "to exercise its control and see that the work is not performed if it does not want it to be performed." 29 C.F.R. 785.13. An employer "cannot sit back and accept the benefits [of work] without compensating for them." Id. ("The mere promulgation of a rule against such work is not enough. Management has the power to enforce the rule and must make every effort to do so.") An employer's failure "to police and oversee hourly workers and their supervisors to ensure that[,] when working through or during unpaid meal breaks[,] they are compensated . . ." potentially violates the FLSA. Fengler, F. Supp. 2d at 195; see also DOL Fact Sheet (explaining that an employer implementing an automatic deduction policy for meal breaks remains "responsible for ensuring that the employees take . . . meal break[s] without interruption").

At least two courts have conditionally certified collective actions based on "shifting the burden" theories similar to White's. See Kuznyetsov v. W. Penn Allegheny Health Sys., No. 2:09-cv-00379-DWA, 2009 WL 1515175, at *5, (W.D. Pa. June 1, 2009); Camesi v. Univ. of Pittsburgh Med. Ctr., No. 09-85J, 2009 WL 1361265, at *4 (W.D. Pa. May 14, 2009). The defendants in these cases were medical centers that required their hourly employees to initiate cancellation of their automatic deductions when they worked through meal breaks. See Kuznyetsov, 2009 WL

23

1515175, at *3-5; Camesi, 2009 WL 1361265, at *1-2.   In both cases, however, the courts spoke at the lenient first stage of the similarly situated analysis, which they recognized in granting conditional certification.   See Kuznyetsov, 2009 WL 1515175, at *5 ("Arguably, Defendants' policies shift the responsibility to the employees.   Consequently, I find this evidence is sufficient at this stage to proceed with conditional certification.") (emphasis added); Camesi, 2009 WL 1361265, at *4 (concluding that the medical center's "arguable attempt to shift statutory responsibilities to [its] workers constitutes an 'employer policy' susceptible to challenge at this stage in the proceedings.") (emphasis added).

Because this action is at the second stage, the burden is higher.   At the first stage, plaintiffs need make only a "modest factual showing" that they are similarly situated.   See Comer, 454 F.3d at 546; Jackson, 2011 WL 1256625, at *14; Pacheco, 655 F. Supp. 2d at 825 (citations omitted); cf. Fisher, 655 F. Supp. 2d at 825.   At the second stage, plaintiffs must offer substantial evidence that they are, in fact, similarly situated. Comer, 454 F.3d at 547.   See Heldman, 2011 WL 465764, at *3; Frye, 2010 WL 3862591, at * 2; Crawford, 2008 WL 2885230, at *5.

At this stage of the litigation, to support a "shifting the burden" theory capable of binding the Opt-in Plaintiffs together, there must be "substantial evidence" that Baptist, in

24

fact, shirked its FLSA responsibilities. As this Court explained in Frye,

> A natural consequence of any employer's adopting an automatic deduction policy is that employees will be required to cancel the deduction if they work through meal breaks. In this sense, any automatic deduction policy 'shifts the burden' to employees. Because the FLSA permits automatic deduction policies, standing alone, this so-called 'burden shift' cannot form the basis of an alleged FLSA violation.

Frye, 2010 WL 3862591, at *7. Standing alone, Baptist's requiring its employees to self-report time worked during meal breaks to ensure they received compensation does not support a common theory of statutory violations capable of overcoming the Opt-in Plaintiffs' otherwise disparate factual and employment settings. Therefore, the Opt-in Plaintiffs are not similarly situated based on that fact alone.

White attempts to bolster her "shifting the burden" theory by pointing to Baptist's "inadequate education, training, and monitoring" about its automatic deduction policy and exception procedures. (Pl.'s Mem. 18-21, 26.) According to White, because of those inadequate measures, "Opt-in [P]laintiffs from across all departments consistently claim that they were not made aware of the general meal break policy . . . or their departments' implementation of that policy during orientation." (See id. at 18.) White also argues the Opt-in Plaintiffs frequently learned about the policy and procedures from their

25

non-supervisory co-workers and that they were "consistently unaware of the accurate meaning of an uninterrupted meal break . . . or of their ability to note partially missed meal breaks on exception logs." (See id. at 19.)

Because at least fifteen of the Opt-in Plaintiffs make those claims, there is some support for them.[5] (See Collective Ex. H, ECF No. 250-9.) However, the vast majority of the Opt-in Plaintiffs deposed by Baptist testified that they were aware of their departments' exception procedures for reporting time worked during meal breaks, and many of them conceded that they used those procedures. (See Collective Ex. 7, ECF No. 235.) If Baptist's education, training, and monitoring were, in fact, inadequate, there would be more evidence that the Opt-in Plaintiffs were unaware of Baptist's policies. That a handful of Opt-in Plaintiffs were unaware of the meal break policy and exception log procedures does not constitute substantial evidence that Baptist shirked its FLSA duties and that the

---

[5] Baptist argues that the Court should not consider the declarations in support of White's arguments because they were submitted through the ECF electronic filing system, but do not include scanned ink signatures. (See Baptist's Reply 14-15.) Under the local rules of this district, third-party affidavits "are to be filed electronically as a scanned image." See W.D. Tenn. Civ. R. Electronic Case Filing (ECF) Policies & Procedures 10.5. White's declarations were submitted as scanned images, but the signatures are type-written, not handwritten. (See Collective Ex. H.) Although the declarations are arguably in violation of the local rules, other district courts have overlooked similar technical shortcomings. See Sammons v. Baxter, No. 1:06-cv-137, 2007 WL 325752, at *4 (E.D. Tenn. Jan. 31, 2007) (considering a plaintiff's affidavit although it was "not a scanned version of the original affidavit and [did] not contain the actual signature of the affiant," in violation of the court's electronic case filing rules and procedures). The Court will consider White's submitted declarations.

otherwise disparately situated Opt-in Plaintiffs are, in fact, similarly situated. See Comer, 454 F.3d at 547; Heldman, 2011 WL 465764, at *3; Frye, 2010 WL 3862591, at * 2; Crawford, 2008 WL 2885230, at *5.

Where employees sometimes use procedures to report time worked outside their normal shifts, but neglect to do so for all time worked, an employer has no reason to know of the unreported time. Cf. Wood v. Mid-Am. Mgmt. Corp., 192 F. App'x. 378, 380 (6th Cir. 2006) (concluding that, because an employee had reported some of his overtime hours, the employer "had no reason to suspect that he neglected to report other overtime hours"). Many of the employees deposed by Baptist admit that they sometimes used the exception procedures. (See Collective Ex. 7.) Because many employees admit that they sometimes used the exception procedures, Baptist had no reason to know that uncompensated work was regularly occurring during meal breaks, that employees were generally unaware of how to use the exception procedures, and that more education, training, and monitoring were needed to improve compliance with its policies. Cf. Wood, 192 F. App'x at 380 ("Quite sensibly, 'an employer cannot suffer or permit an employee to perform services about which the employer knows nothing.'") (quoting Holzapfel v. Town of Newburgh, 145 F.3d 516, 524 (2d Cir. 1998)).

Baptist has shown that the Opt-in Plaintiffs are disparately situated with regard to location, job duties, and supervision.  The record contains little evidence of a common FLSA-violative policy or common theory of FLSA violations capable of binding them together.  Based on the record before the Court, the differences among the Opt-in Plaintiffs' factual and employment settings outweigh the similarities between them.  The first factor weighs in favor of decertification.

### 2. Individualized Defenses

The second relevant factor is the extent to which defenses appear to be individual to each plaintiff.  Wilks, 2006 WL 2821700, at *7.  The presence of many individualized defenses makes a representative class unmanageable, and "several courts have granted motions for decertification on this basis." Crawford, 2008 WL 2885230, at *9 (quoting Moss v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000)).

Baptist argues that its defenses are "just as disparate and individualized as the facts and circumstances of the" Opt-in Plaintiffs' employment.  (See Baptist's Mem. 43-60.)  According to Baptist, it would be forced to conduct individualized evidentiary inquiries to determine, among other things, whether each Opt-in Plaintiff experienced missed or interrupted meal breaks, knew of or used the exception procedures, was discouraged from using those procedures, and, ultimately, worked

enough hours to be eligible for overtime compensation. (See id. at 43-44.) Baptist also asserts that it would raise defenses based on bankruptcy, the statute of limitations, and credibility that are individual to each plaintiff. (See id. 45-57.) White argues that Baptist's arguments do not support decertification because they are common to any FLSA collective action. (See Pl.'s Mem. 28-31.)

That a defendant, and a court, may be required to conduct individualized evidentiary inquiries into each opt-in plaintiff's FLSA claim does not necessarily make collective treatment improper. See O'Brien, 575 F.3d at 584-85 (explaining that "such a collection of individualized analyses is required of the district court"); Monroe, 2011 WL 442050, at *14 (explaining that "many of the purported defenses . . . [were] clearly amenable to classwide determination"); Crawford, 2008 WL 2885230, at *10-11 (noting that many of the asserted defenses were "uniform and suitable for assertion against each plaintiff who testifies at trial"). If the plaintiffs' claims are "unified by common theories of . . . statutory violations," they are similarly situated, "even if the proofs of these theories are inevitably individualized and distinct." See O'Brien, 575 F.3d at 585.

Bankruptcy and credibility defenses do not necessarily preclude collective treatment. See Crawford, 2008 WL 2885230,

at *10-11 (explaining that "contradictions in testimony among the plaintiffs are matters of credibility for the factfinder, not individualized defenses" and that the "lack of standing due to bankruptcy filings would not require individualized proof at trial") (citations omitted); cf. Monroe, 2011 WL 442050, at *14 (explaining that credibility was an issue for the finder of fact that could be raised against opt-in plaintiffs testifying in a representative capacity at trial).   A defense based on the statute of limitations, including whether the FLSA's two-year limitations period for non-willful violations or three-year limitations period for willful violations applies, also does not preclude collective treatment.   Cf. Monroe, 2011 WL 442050, at *14 (explaining that whether "management knew of the methods being used to deny overtime pay and whether Defendants acted willfully" were "clearly amenable to classwide determination").

If the Opt-in Plaintiffs' factual and employment settings were similar, the defenses Baptist raises would not make a collective action unmanageable.   See O'Brien, 575 F.3d at 584-85; Monroe, 2011 WL 442050, at *14; Crawford, 2008 WL 2885230, at *10.   Unlike the plaintiffs in O'Brien, Monroe, and Crawford, the record does not contain substantial evidence that the Opt-in Plaintiffs are similarly situated.   See O'Brien, 575 F.3d at 584-85; Monroe, 2011 WL 442050, at *13; Crawford, 2008 WL 2885230, at *5-9.   As in Frye, although Baptist's purported

individualized defenses would not preclude collective action if the Opt-in Plaintiffs were similarly situated, those defenses do not necessarily weigh in favor of collective treatment.   See Frye, 2010 WL 3862591, at *8-9.   The second factor is neutral.

### 3. Fairness and Manageability

To analyze the third factor, courts consider whether collective treatment comports with the purposes of the FLSA, which Congress intended to be "broadly remedial and humanitarian."  Wilks, 2006 WL 2821700, at *8 (quoting Donovan v. Brandel, 736 F.2d 1114, 1116 (6th Cir. 1984)).   Courts balance the reduced cost to individual plaintiffs and any increased judicial utility that might result from collective action against the potential detriment to the defendant and any possible judicial inefficiency.   See id. (citing Hoffman-La Rouche, Inc. v. Sperling, 493 U.S. 165, 170 (1989); see also Crawford, 2008 WL 2885230, at * 11 (explaining that, in analyzing the third factor, courts "consider that the primary objectives of a § 216(b) collective action are: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity" (citation and internal quotation marks omitted))).   As a remedial statute, the FLSA "must not be interpreted or applied in a narrow, grudging manner."   Dunlop v.

31

Carriage Carpet Co., 548 F.2d 139, 144 (6th Cir. 1977).
However, "the remedial nature of the FLSA, standing alone, does
not justify allowing a case to proceed collectively." See
Crawford, 2008 WL 2885230, at * 11 (citation and internal
quotation marks omitted).

Baptist argues that, because of the Opt-in Plaintiffs'
varied employment settings and its individualized defenses, the
collective action would "consist of hundreds of 'mini-trials' in
which each [Opt-in] Plaintiff attempted to prove a series of
small, off-the-clock claims" and would require it to depose
nearly every Opt-in Plaintiff in preparation. (See Baptist's
Mem. 60-61.) White argues that the case should proceed
collectively because, it if were decertified and the Opt-in
Plaintiffs filed individual claims, each would have to establish
proof about Baptist's automatic deduction policy, because that
policy forms the basis of each of their claims. (See Pl.'s Mem.
31-34.) White also argues that, because the automatic deduction
policy was implemented at a departmental level, "representative
testimony would be exceedingly manageable." (See id. at 32.)

That a collective action might result in "mini-trials" does
not necessarily justify decertification. See Monroe, 2011 WL
442050, at *14. Where a collective action is decertified, and
the opt-in plaintiffs file individual claims, the claims that
would otherwise have been "mini-trials" within the collective

32

action become their own independent actions.  See Monroe, 2011 WL 442050, at *14.  Where opt-in plaintiffs have shown that they are similarly situated, plaintiffs are deprived of the benefit of pooling their resources and judicial economy is reduced.  See id. ("If not addressed as a collective action, the claims of the plaintiff class would have to be heard in individual suits—perhaps requiring more than 300 mini-trials."); Crawford, 2008 WL 2885230, at * 11-12 ("Not only would decertification place each plaintiff back at square one without the benefit of pooled resources, but also the court would be required to consider the same common question of whether the defendant had a de facto policy or practice of denying the plaintiffs a bona fide meal period.")  Because White has not shown that the Opt-in Plaintiffs are similarly situated, however, there is no judicial economy to be gained by allowing their claims to proceed collectively.  The only possible results are unfairness to Baptist and manageability problems for the Court.  See Frye, 2010 WL 3862591, at *11-12.

White argues that representative testimony at a departmental level would resolve any fairness and manageability issues.  (See Pl.'s Mem. 32.)  Although representative testimony could theoretically assuage the Court's concerns, White has not directed the Court to any deposition testimony that would be representative.  In addressing the Opt-in Plaintiffs' factual

and employment circumstances, the only evidence she submits are declarations, not depositions. (See id. 14-28.) If representative testimony that would resolve the fairness and manageability issues in this litigation were readily available, the Court would expect White to rely on that testimony to support her argument that the Opt-in Plaintiffs are similarly situated. There is no representative testimony before the Court that would resolve the fairness and manageability issues inherent in proceeding collectively.[6] The third factor weighs in favor of decertification.

No substantial evidence of a common policy or theory of FLSA violations overcomes the Opt-in Plaintiffs' otherwise disparate and factual employment settings. Although individualized defenses would not preclude proceeding collectively, because the Opt-in Plaintiffs are not similarly situated, doing so would be unfair to Baptist and inefficient for the Court. On balance, the differences among the Opt-in Plaintiffs outweigh the similarities of the practices to which they were allegedly subjected. See Monroe, 2011 WL 442050, at *12. Baptist's motion to decertify is well-taken.

---

[6] For the same reason, White's argument for partial decertification of the Opt-in Plaintiffs based on department is not well-taken. (See Pl.'s Resp. 18.) White argues that any differences among the Opt-in Plaintiffs "would support the creation of various sub-classes from each department or floor rather than the complete decertification of the collective action." (Id.) Because White has not proffered testimony that would be representative of the departmental sub-classes she proposes, partial decertification would not resolve the fairness and manageability issues in this litigation.

**V.   Conclusion**

Because White no longer has an FLSA claim, she is not similarly situated to the Opt-in Plaintiffs.   Considering the Opt-in Plaintiffs themselves, there is not substantial evidence that they are similarly situated to one other.   Decertification is proper.

Baptist's Motion is GRANTED.   The claims of all plaintiffs other than White are DISMISSED WITHOUT PREJUDICE.

So ordered this 17th day of May, 2011.


s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE